**Affirm and Opinion Filed June 1, 2023**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-18-00861-CR**

**CHRISTOPHER MICHAEL RUBIO, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 363rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1633703-W**

## MEMORANDUM OPINION ON REMAND

Before Justices Molberg, Partida-Kipness, and Smith[1]
Opinion by Justice Molberg

Appellant Christopher Rubio was found guilty of capital murder and sentenced to the mandatory punishment of life imprisonment without the possibility of parole. We affirmed on original submission to this Court in *Rubio v. State*, 596 S.W.3d 410 (Tex. App.—Dallas 2020). In our opinion, we concluded Rubio's amended motion for new trial was untimely, and as a result, we considered his ineffective assistance of counsel claims based only on the trial record, without giving

---

[1] Justice Craig Smith has substituted on the submission panel on remand in place of Justice David Bridges, who participated in the decision of this case on original submission but subsequently passed away. Justice Smith has reviewed the briefs and record in this case.

consideration to the arguments in his amended motion for new trial or the evidence presented at the hearing on the motion.

The court of criminal appeals reversed, holding that Texas Rule of Appellate Procedure 21.4(b) allows the trial court to grant leave for a defendant to file an amended motion for new trial within the thirty-day time period provided in the rule, and that "the court may do so regardless of whether it has overruled a previous motion for new trial."  638 S.W.3d 693, 704 (Tex. Crim. App. 2022).  The court of criminal appeals remanded to us "to consider the arguments in, and evidence presented at, the hearing on Appellant's amended motion for new trial."  *Id*. at 704. Thus, we will consider Rubio's *McCoy v. Louisiana* and ineffective assistance of counsel claims in light of the arguments made and evidence presented at the hearing on the amended motion for new trial.[2]  We affirm in this memorandum opinion.  *See* TEX. R. APP. P. 47.4.

## Background

We limit our discussion of the facts to those pertinent to the ineffective assistance of counsel issues presented.  Before voir dire, Rubio testified on the record about defense counsel, Paul Johnson, and his representation.  Rubio acknowledged they had discussed the "dire situation" he was in; that the State had refused to offer a plea bargain agreement despite Johnson seeking one on many occasions; that the

---

[2] Rubio's amended motion for new trial and the hearing on the amended motion did not address his fourth, fifth, and sixth appellate issues, and we do not revisit them in this opinion.  *See Richards v. State*, 644 S.W.2d 182, 183 (Tex. App.—Dallas 1982, no pet.).

–2–

punishment he faced if found guilty was automatically life in prison without parole; that Johnson had explained sentencing to him; that he understood Johnson had tried to "find something," including mental health issues, to help Rubio in his case; that he understood Johnson had consulted with others in an effort to find a way to give Rubio "an out or at least a better sentence"; that he understood the State had to prove he caused the death of more than one individual during the same transaction; and that he had gone over the statement he gave to the police and other witness statements, and that he generally understood what he was up against.

During jury selection, Johnson repeatedly stressed that Rubio did not have to prove his innocence, and that the State had the burden to prove his guilt beyond a reasonable doubt. He questioned potential jurors about their fidelity to these principles. Johnson explained the difference between innocence and a "not guilty" verdict. He also explained that the jury should base its verdict on the evidence put forth in a particular case. "[I]f they haven't convinced you, then your duty is not to go back there and say I don't think he did it. The question is have you convinced me beyond all doubt that he did do it[?]" Johnson discussed an accused's right under the Fifth Amendment not to incriminate himself, and questioned the jury panel about whether they would hold it against a defendant who did not testify in his defense. Johnson also explained the different types of capital murder, and the fact that in this case, the death penalty was not being sought by the State.

At trial, the State presented evidence showing that Rubio killed Elizabeth Adams and James Tews. In our first opinion, we described the facts as follows:

> Rubio and Elizabeth Adams dated and they had two children together. They resided in Rubio's apartment, which was located in the same apartment complex where Elizabeth's mother, Connie Adams, lived. Rubio and Elizabeth broke up but they continued to live together. Rubio began dating Dana Grove, who moved into the apartment with Rubio and Elizabeth. Elizabeth began dating James [Tews] a few weeks before Rubio killed them both.
>
> At approximately noon on the day of the murders, Rubio and Dana were asleep in his apartment when Connie, John Adams (Elizabeth's brother), and Janice Rist (a family friend), helped move Elizabeth's belongings out of Rubio's apartment and into Connie's apartment. After the move was complete, Connie left to get food, leaving Elizabeth, Janice, John, Timothy and Jennifer (Elizabeth's other siblings), and James, who had come to visit Elizabeth, in the apartment. At trial, Dana testified that when Rubio woke up and realized Elizabeth's belongings were gone, he became upset and left the apartment to look for the children. Rubio shortly returned to the apartment, took his shotgun out of the closet and loaded it. Dana testified Rubio was angry, and he was yelling "something about [Elizabeth] threatening to take the kids[.]" According to Dana, Rubio knew the children were with Elizabeth's grandparents and Elizabeth was at Connie's apartment. As Rubio loaded his shotgun, Dana tried to calm him, but "[he was] not listening. He's going, [']I'm tired, I can't do it anymore[']." Rubio left the apartment with his shotgun. When he returned approximately twenty minutes later, Rubio told Dana, "I killed them. I did it. I killed them. They're dead."
>
> Elizabeth's brother John testified he was at Connie's apartment when Rubio knocked on the door and demanded to know where Elizabeth and the children were. Rubio left when John said he did not know. Shortly thereafter, Rubio returned to Connie's apartment with a shotgun. When John answered the door, Rubio threatened to kill him and then forcibly entered Connie's apartment and went upstairs. A few moments later, gunshots were fired. Rubio fled Connie's apartment and ran into his apartment. When John discovered James dead in the bathroom, he ran out of Connie's apartment.

Timothy Adams, Elizabeth's brother, lived with Connie. Prior to Rubio's arrival at Connie's apartment on the day of the murders, Timothy, Elizabeth, and James were in Timothy's bedroom watching a movie for a while before Elizabeth and James went to Connie's bedroom. Timothy testified he was sitting on his bed when Rubio entered his bedroom with a shotgun and demanded to know Elizabeth's whereabouts. When Timothy said he did not know, Rubio went to Connie's bedroom, where Janice was hiding, and he kicked open the locked bedroom door.[1] According to Janice, Elizabeth and James were hiding in the upstairs bathroom. Rubio pointed the shotgun at Janice and said, "Where's the fucking bitch." When Janice replied she did not know, Rubio returned to Timothy's bedroom.

Rubio then went to the upstairs bathroom and said, "James, open up the door—open the door." Rubio attempted to kick open the door, but James was pushing the door from inside the bathroom to prevent Rubio from entering and "there [was] too much force on the other side for anything to happen." Rubio "tells James that he has one more chance to open the bathroom door . . . he counts to three and he shoots through [the door]." Rubio entered the bathroom and fired more shots. The police discovered James' body on the bathroom floor and Elizabeth's body in the bathtub. Both James and Elizabeth had been shot. At the time of their deaths, Elizabeth was nineteen years old and James was twenty.

596 S.W.3d at 417–18 (footnote omitted). Johnson opted not to make an opening statement after the State made its opening statement. The State called numerous witnesses, and Johnson did not cross-examine them. Johnson made several objections on grounds of hearsay and relevance. After the testimony of Dana Grove, Johnson questioned Rubio outside the presence of the jury as follows:

Chris, we spoke at the pretrial hearing in regards to the nature of the allegations against you and the fact that we investigated any possible defenses regarding mental health and hired a psychologist that interviewed the pertinent people in this story. You know that her and I had interviewed Dana Grove, Niki, one of the witnesses that just

testified, as well as your mother and talked to people about the fact of whether or not there were any pertinent mental or medical issues that needed to be investigated or raised that we could raise in regards to this case. You and I have had a chance to talk about all of that; is that right?

Rubio: Yes, sir.

Johnson: Without really going into strategy, you and I have had opportunities to go through the police reports, the statements, what we expected these witnesses to testify to, and in the courtroom today they have been testifying. You and I have had opportunities to talk and discuss during that testimony what they are saying, what we expected them to say, and what they did say; is that right?

Rubio: Yes, sir.

Johnson: In that regard, it's very unusual that I hadn't been cross-examining these witnesses with regards to their recollection of the events that transpired, but I've discussed those things with you, and you have been in agreement that basically there's nothing, other than extremely minor points that have nothing to do with the actual activities of what took place that day. You've been in agreement through this point that there has been nothing said or raised in the courtroom that you felt was necessary to cross-examine; is that correct?

Rubio: I could not think of anything.

Johnson: Right. You and I spoke about it because you knew that I had previously interviewed Dana as well as the other witnesses and talked to them about the mental states and your behavior and those things. Just so that the record's clear, this is -- the way we're conducting this trial has been done after we discussed it with each witness and you have been in agreement; is that correct?

Rubio: Yes, sir.

In closing argument, Johnson argued to the jury, among other things, that the "defendant was entitled to hold the State to their burden of proof, and we've done that." After deliberating, the jury found Rubio guilty of capital murder as charged

–6–

in the indictment, and the trial court sentenced him to life imprisonment without the possibility of parole.

On July 11, 2018, Rubio filed a motion for new trial, generally alleging the verdict was contrary to the law and the evidence. The trial court denied the motion. On August 10, 2018, Rubio filed an amended motion for new trial and a motion for leave to file such an amended motion for new trial. The motion asserted Johnson violated Rubio's autonomy and rendered ineffective assistance of counsel. Attached to the motion was an affidavit from Rubio, an affidavit from a forensic neuropsychologist who reviewed Rubio's records, a pretrial motion filed by Johnson, and "Judicial Information" printouts from other cases with which Johnson was involved. Rubio stated in his affidavit he met Johnson for the first time "three or four months after [he] got to the Dallas County Jail"; he never got Johnson's contact information; the first two times they met were "on the webcam," and they met "about three other times in the holdover cell by the courtroom"; Johnson did not show him discovery until their final meeting in the holdover cell in June 2018, and even then, he "scrolled through [it] quickly" and never showed him his police statement; he did not remember making a statement to police; Johnson disagreed with Rubio's ideas about a defense and said the case was "indefensible"; he did not remember anything about the offense and did not believe he was guilty; they discussed Rubio's multiple personalities briefly in 2016 but did not revisit the subject until 2017 or 2018; he did not recall ever meeting Dr. Kristi Compton, who

had been hired by Johnson to evaluate Rubio, and who, Johnson told him, based her evaluation of him on the video of his police interview, although Rubio stated he believed Dr. Compton interviewed Grove, Rubio's mother, grandmother, and aunt; Dr. Compton's assistant visited him in jail once to get him to sign record releases; Johnson did not try to get to know Rubio; if the State had offered a plea bargain, he would have considered it; he did not find out when trial was until his mother told him; he filed a motion to dismiss counsel a week before trial "because we had no relationship"; during both a pretrial hearing and trial, Johnson reviewed documents from a different case; before making his closing argument, Johnson asked Rubio, "So you want me to tell them you didn't do it?" Rubio responded, "I am not guilty; I don't remember doing it"; and Johnson told Rubio he made a bet with the bailiff that the jury "would take less than four minutes to decide my case."

Rubio stated in his affidavit he spent a lot of time alone growing up, played "thousands of hours of video games[,]" did not have "any friends over until I was 15 or 16[,]" and his mother, who "had mental and physical problems," regularly worked twelve-, sixteen-, or twenty-hour shifts; they struggled financially, and his mother often could not pay the water or electricity bills, causing them to go without water or power for "extended periods of time"; he was diagnosed with Type 2 diabetes as a child, for which he did not receive treatment because the prescribed medication made him sick; he had terrible migraines growing up, he was suicidal and "once cut [himself] to the bone" and "also intentionally overdosed"; growing up, he had

"invisible friends and also developed multiple personalities," which helped him cope; and it was important to him "and them that [he] be a very good father and provide for [his] children."

Rubio also attached to his amended motion for new trial an affidavit from Dr. Robert Stanulis, a forensic neuropsychologist practicing in Portland, Oregon. Dr. Stanulis stated in his affidavit he had reviewed Rubio's Parkland Health and Hospital System records and jail records from between May 20, 2016, and July 17, 2018, Parkland records from July 2, 2016, to July 6, 2016, Dallas County jail incident reports from May 25, 2016, through July 11, 2018, defense counsel's notes, Rubio's affidavit, and a *Dallas Morning News* article; he did not "have enough information to render a fully-informed opinion," but nevertheless stated he saw "viable avenues for pursuing a defense of insanity"; diabetes is associated with co-morbid psychiatric disorders, including increased likelihood of hypoglycemic delirium, which can involve hallucinations and "thought disturbance," and schizophrenia; two days after his arrest, Rubio's glucose test was more than twice the normal level, and he "was hallucinating multiple personalities and concerned about others 'trying to take his children'"; within a week of being in jail, Rubio was depressed, suicidal, and complaining of hearing voices; he was given anti-psychotic medication and received a diagnosis of schizoaffective disorder; an inmate reported on May 25, 2016, that Rubio was "trying to kill himself"; Rubio told sheriff's deputies that "the voices in my head came back" and he needed help; he was placed on suicide

precautions on May 28, 2016; Rubio was observed hitting his head on the wall in order to, he said, "stop the voices"; there was "concern for self-mutilation" after blood was observed around his genitals; in July 2016, Rubio was sent to Parkland after he was "having the shakes" and drooling; the Parkland records show diagnoses of diabetes and schizoaffective disorder; because Rubio was observed "experiencing psychosis at the jail," it is "extremely likely he was experiencing psychosis at the time of the offense"; Rubio's brain was not fully developed as he was just twenty years old; Rubio's long history of poorly controlled diabetes "can affect brain development as well as cause cognitive and behavioral problems, including increased aggression and poor impulse control"; that Rubio was "shooting through doors suggests unformed mens rea" instead of intentional killings; the records supported a conclusion that Rubio "was in an acute psychotic state with toxic levels of blood sugars at the time of the offense"; Rubio "was psychotic, in a disordered metabolic state, and hence suffering from severe mental disease or defect at the time of the instant offense"; and the legal significance of the above "would require review of all of the discovery, further investigation[,] and an evaluation of Rubio."

At the September 21, 2018 hearing on the amended motion for new trial, Johnson testified he became aware that the State would not be seeking the death penalty in this case "almost immediately." Johnson stated he communicated with Rubio "pretty regularly," including through web camera, the holdover cell in the courthouse, through Rubio's mother, and a couple of jail visits. Their conversations

–10–

lasted "fifteen minutes, thirty minutes, or whatever—it just depended on what we were discussing." When he first met with Rubio, Rubio explained to him what happened, and Johnson testified Rubio's report was consistent with the discovery he received from the State and with what Rubio told detectives when they interviewed him. Johnson stated the evidence showed Rubio's motivation in committing the murders was anger and rage that his ex-girlfriend left him for another man, and the situation spiraled out of control.

Johnson disagreed with Rubio's contention that he did not review discovery with Rubio until their final meeting in the holdover cell in June 2018. Instead, Johnson testified they talked about discovery on several occasions, noting "[t]here was no question of what had taken place and what had occurred." Johnson said Rubio did not inquire regarding discovery because he was "aware of what had happened," of "who had seen him do it," and that "he had given a confession to doing it." Johnson stated he learned about Rubio's background and his upbringing "to an extent." Rubio had explained to Johnson that he had had a "rough childhood." Johnson described Rubio as exceptionally bright, nice, and easy to work with.

Johnson considered Rubio's case indefensible from the "standpoint of the facts of what had occurred," but the "question was what we could possibly do for him for purposes of some type of mitigation of a punishment." Johnson said he did not need to file a formal discovery request under the Michael Morton Act because the prosecutor made all the evidence available to him. He stated if there was

–11–

anything within that evidence that warranted a pretrial motion of some sort, he would have filed it. Johnson learned from the State that it did not intend to offer Rubio's confession into evidence, so its voluntariness was not at issue. Johnson filed a pretrial "omnibus motion." When a question arose about the availability of the medical examiner, Johnson told the State he would not object to an alternate testifying if they agreed "not to use a single autopsy photograph and exhibit any autopsy photographs . . . ." Johnson presented this option to Rubio, and he "readily agreed" because he did not "want to put anybody through [that]."

Johnson hired a psychologist, Dr. Kristi Compton, to consider anything that "might have been applicable and might have been usable in his trial." But Johnson said he did not believe there was any basis for a defense like insanity. He "never saw any signs whatsoever that Rubio was insane at any time during my representation or anything that would lead me to believe that he was suffering from any type of insanity at the time of the offense." Johnson became aware "during the beginning" of his representation that Rubio claimed he had multiple personalities. Rubio told him Elizabeth was aware Rubio claimed he had been hearing voices. Johnson said he and Dr. Compton interviewed Rubio's mother, grandmother, and Grove to try to substantiate Rubio's claim. Johnson was not aware whether Rubio's middle school girlfriend knew of the multiple personalities or other mental health issue. Rubio told Johnson "there was no one besides [the people they reached out to] that could offer any help or any information in that regard." Johnson had to

–12–

determine whether Rubio really had a mental disorder or whether Rubio was "malingering, based upon the situation that he was in and based upon his life history." In making that determination, he was "guided by the mental health professionals," and concluded the claim of hearing voices and multiple personalities "was more of a case of malingering to escape criminal responsibility." Johnson stated the evidence indicated Rubio was not insane when he committed the offense because everything "was goal-directed." Events in Rubio's life led up to the offense, he made threats he might do something, he committed the offense, and then told people he committed the offense.

Rubio was evaluated by Dr. Compton, who had been instructed by Johnson to determine whether there was any basis for the multiple personalities claim or any issue that could have risen to a level of insanity at the time of the offense. Johnson said he did not limit her inquiry; as he said, "She's very creative, but at the same time, she's very ethical. She won't make up something that she doesn't feel is there, but she will push the bounds on trying to find something to help the client." Dr. Compton saw Rubio more than once. And she and Johnson interviewed Rubio's mother, ex-girlfriend, and grandmother. Dr. Compton concluded Rubio "appeared to be malingering, and she felt that he might have a borderline personality disorder." But she did not find any evidence of anything in Rubio's mental state that would have substantiated "any type of claim of insanity."

When questioned whether he considered if Rubio's emotional immaturity could be indicative of brain injury or stunted brain development, Johnson stated he inquired whether Rubio had ever "had any problems in that regard at all and was always told 'no.'" Rubio had never been diagnosed with anything and "never had any type of a problem." Johnson said when he takes on a case like this one, he,

> know[s] the questions to ask to begin the inquiry to determine whether or not, at least, is it necessary for me to hire somebody with the knowledge to perfect or to assist me in doing it. So there wasn't a stone left unturned in regards to -- he didn't sit there and suck his thumb when I talked to him. He sat there and talked to me like an adult.

When questioned why he did not explore further Rubio's claim he was hearing voices, Johnson stated:

> There was nothing to indicate that any of his activities were being affected by any type of a voice that he's claiming to have heard. I mean, it was -- believe me, like I said, I've dealt with people before with schizophrenia and true psychotic delusions, auditory and visual hallucinations. To me it appeared that Chris was grasping at some type of an explanation to explain what he had done.

Johnson also stated he did not investigate whether Rubio might have ADHD. Johnson said Rubio's first story—that he heard voices—changed about a month before the trial when Rubio claimed he did not remember ever committing the crime or seeing Dr. Compton.

Johnson testified he had not reviewed Rubio's school records, which Rubio admitted as a hearing exhibit under seal. Johnson said Rubio told him he was a high school graduate and that there were not any significant issues on that front. Johnson

knew Rubio's mother was absent "quite a bit," and he was thus "free to roam and do the things he did, but he told me he did fine in school, as far as at least getting in there and getting out of school." Rubio questioned Johnson about whether he was aware Rubio spent most of his youth isolated while his mother worked long shifts at work and that he went for long stretches "alone without electricity." Johnson testified Rubio told him that, but not "what the periods of time were." Johnson continued:

> Like I said, I got his biographical information from him, but in regards to -- as far as these issues you're talking about go to the issues in regarding mitigation instead of legal excuse or justification, and I know – I'm pretty sure what you're trying to do is use this as a building block, but it gets down to -- with the things that you're saying and what-ifs and the things that we're looking for, in light of the fact that this was not a death penalty case where there was going to be -- there is no portion of the proceeding in which mitigating factors are going to be presented.
>
> But as far as -- as I said earlier, I knew the questions to ask him and find out, because originally when I talked to him, I mean, at that point in time, we didn't know for sure if it would have ever been considered for a death case, even though it certainly appeared that it probably would not.

Johnson testified he knew, because Rubio told him, that Rubio went long periods without electricity, went for up to a year without running water, suffered from migraines, and had diabetes. Johnson said Rubio told him he discontinued his diabetes treatments because they made him sick, and he said he was aware untreated diabetes can cause physical brain impairment. But, Johnson said, he did not consider

requesting funds for brain imaging. He testified if any evidence had warranted that, Dr. Compton would have recommended it to him.

Rubio questioned Johnson about whether he was aware that severe deprivation in a parent "could result in a gene mutation" for their children, and whether he knew Rubio's mother suffered hypoxia as a child. Johnson was aware of the former but not the latter. He was also aware of the link between childhood neglect and poverty and post-traumatic stress disorder, and he was aware Rubio had abandonment issues relating to his father. Johnson did not think the crime had "as much to do with the kids as it had to do with [the victim]."

Johnson reviewed the Parkland jail health records, Parkland Hospital records from July 2016, and the reports from jail regarding Rubio hearing voices and self-mutilation. Johnson did not "find Rubio to be substantially impaired in any way." He testified that the Parkland psychiatrist noted that Rubio's presentation was inconsistent with his level of psychosis and suspected fabrication, which was also Dr. Compton's impression.

Johnson sought a plea bargain agreement from the State in this case. Every time he saw the lead prosecutor for several months—"probably a minimum of 30 or 40" times—he raised the issue. He stressed that Rubio "was a troubled kid, he had a bad time, and he was -- went through a bad situation, and, I mean, she was well aware of the situation and she was sympathetic to it. And had the situation been a little different, if he had -- if he hadn't killed the male that was with his ex-girlfriend,

we would have settled this case." Johnson did not think a "mitigation packet"—"some sort of presentation of all this evidence"—would have made a difference. The lead prosecutor went to the family of victim James Tews at Johnson's request "on more than one occasion." Tews's family wanted the harshest possible punishment for Rubio. Johnson indicated "the district attorney's hands were tied in making an offer." Johnson stated the best this case was "ever going to be would have been . . . life with parole on a murder," and he "couldn't wiggle that out." The State never made a plea bargain offer.

Johnson said Rubio's claim that they met together a total of only five times was "absolutely incorrect." Johnson also rejected Rubio's claim that throughout their conversations, Rubio stated "he did not believe he was guilty" and that Rubio told Johnson before closing argument not to say he was guilty. Johnson testified Rubio "understood the predicament and the situation that he was in." The only reason they went to trial was because "the State would not give us an avenue to escape the trial." Johnson said "it wasn't going to be a situation where there was ever going to be a verdict of less than guilty, in my professional opinion." Still, the State was going to have to prove its case—Johnson testified that he did not say during voir dire, closing, or punishment that Rubio was guilty. At trial, Rubio "had no dispute with anything any of [the witnesses against him] were saying." Johnson said he asked Rubio if there were any questions he could think of for Johnson to ask,

and there were none. Johnson denied Rubio's claim that he made a bet with the bailiff about how long it would take the jury to return with a verdict.

After hearing argument, the trial court denied Rubio's amended motion for new trial.

**Discussion**

Rubio's first three issues on appeal reference his amended motion for new trial and evidence presented at the hearing on the motion, so in this opinion on remand we will revisit those three issues in light of the arguments made in, and evidence presented at, the hearing on Rubio's motion.

We first consider a preliminary question of what evidence was presented at the hearing. At a hearing on a motion for new trial, the court "may receive evidence by affidavit or otherwise." TEX. R. APP. P. 21.7; *Lee v. State*, 186 S.W.3d 649, 658 (Tex. App.—Dallas 2006, pet. ref'd). However, an affidavit attached to a motion for new trial is "not evidence in itself;" it must be introduced at the hearing on the motion to constitute evidence. *Stephenson v. State*, 494 S.W.2d 900, 909–10 (Tex. Crim. App. 1973); *see also Gallamore v. State*, No. 05-14-01591-CR, 2016 WL 1622635, at *10 (Tex. App.—Dallas Apr. 20, 2016, pet. ref'd) (mem. op., not designated for publication) ("Motions for new trial are not self-proving and any allegations made in support of them by way of affidavit or otherwise must be offered into evidence at a hearing."); *Jackson v. State*, 139 S.W.3d 7, 20 (Tex. App.—Fort Worth 2004, pet. ref'd); *Godoy v. State*, 122 S.W.3d 315, 319 (Tex. App.—Houston

–18–

[1st Dist.] 2003, pet. ref'd); *Lincicome v. State*, 3 S.W.3d 644, 646 (Tex. App.—Amarillo 1999, no pet.). An affidavit attached to a motion for new trial is a "prerequisite to obtaining a hearing[,]" and its purpose "is to authorize the introduction of supporting evidence and to limit the parameters of the hearing that is sought." *Fletcher v. State*, No. 05-09-00691-CR, 2010 WL 4010819, at *3 (Tex. App.—Dallas Oct. 14, 2010, pet. ref'd) (mem. op., not designated for publication).

At the hearing on the amended motion for new trial, Rubio did not introduce into evidence the affidavits attached to his amended motion. Evidence was presented through the testimony of Johnson, and Rubio offered his school records as an exhibit, but no other evidence was explicitly admitted at the hearing. Although nothing in the record indicates the trial court reviewed or considered Rubio's affidavit or Dr. Stanulis's affidavit in reaching its decision on the amended motion,[3] the trial court stated it had read the motion, and the parties referred to the affidavits during Johnson's testimony. Thus, though we question whether the affidavits were properly admitted in evidence at the hearing, we will assume they were admitted and will accordingly review the trial court's decision in light of their contents, in addition to the other evidence admitted.

---

[3] *See Godoy*, 122 S.W.3d at 320 ("[D]uring the motion for new trial hearing, the State did not object when the trial court indicated it had reviewed the affidavits and medical records and treated them as having been admitted. Accordingly, we consider the affidavits and medical records, which were impliedly admitted into evidence as if formally admitted into evidence."); *Bahlo v. State*, 707 S.W.2d 249, 252 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd) (when appellant asked at hearing that affidavit be "made part and parcel of" motion, and the trial court stated it "be made part of the record," court of appeals concluded the affidavit was in evidence).

### McCoy v. Louisiana

In his first issue, Rubio argues Johnson "conceded his guilt against appellant's will to maintain his innocence when he . . . effectively argued in closing that there was no logical conclusion but guilt." We rejected this contention on original submission, finding "defense counsel's closing argument, considered in context with his voir dire remarks, plainly did not concede his client's guilt. At no time did defense counsel state that Rubio committed murder. Nor did he concede facts that showed Rubio was guilty of an element of the offense of murder. To the contrary, counsel's closing argument held the State to its burden of proof . . . ." *Rubio*, 596 S.W.3d at 425. Because nothing presented at the hearing on the amended motion for new trial affects our prior analysis of this issue, we will again overrule Rubio's first issue.

When a criminal defendant expressly asserts that the objective of his defense is to maintain innocence, the Sixth Amendment prohibits his lawyer from conceding guilt. *McCoy v. Louisiana*, 138 S. Ct. 1500, 1509 (2018). If counsel violates his client's autonomy in this way, he injects structural error into the trial, and it is not subject to harmless-error review. *Id.* at 1511. In *McCoy*, defense counsel told the jury in his opening statement there was "no way reasonably possible" they could hear the evidence and reach "any other conclusion than [McCoy] was the cause of" the victims' deaths, and stated that "my client committed three murders." 138 S. Ct. 1500, 1506–07 (2018). In closing argument, defense counsel "reiterated that McCoy

–20–

was the killer. On that issue, [defense counsel] told the jury that he 'took [the] burden off of [the prosecutor].'" *Id.* at 1507. The Supreme Court held counsel's actions were incompatible with the Sixth Amendment. *Id.* at 1512.

Here, Johnson argued in closing as follows:

Ladies and gentlemen, you've been here for the last few days and seen a trial unlike any trial that you will probably ever see if you were called down here for the rest of your lives to be on jury duty. We talked to you in the voir dire process about the fact that the defendant was charged with a crime; that if you, in fact, committed the offense, there is no other issues [sic] involved.

As I stood in the voir dire process and talked to you and explained to you the way a trial works, you did not have the knowledge at that point in time, and certainly we couldn't stand before you and I couldn't stand before you and tell you about how bad the facts of the case were going to be that you were going to hear. But we talked to you about the fact that when you listen to the evidence, the State has to be held to meet their burden of proof, and that same thing applies whether they have a good case or a bad case.

So as we sat here this week, I didn't insult your intelligence by questions in regards to things that weren't going to be important. There's things that's required by the law. The defendant was entitled to hold the State to their burden of proof, and we've done that. You will go back there and you'll ask yourself the question that I spoke to you about in voir dire as to whether or not the State has proven this case to you.

Certainly, as I stand here before you, you've seen the evidence. I'm not going to stand here and make a mockery of common sense and reason as I talk to you now. It's a shame that in a situation like this, you only get to hear part of the case regarding the thing that Christopher Rubio is accused of doing. And with all of his loved ones and folks who can speak and talk about who was the person that may have done these things, you don't get to hear that because there is no punishment phase in this type of a trial.

So as I stand before you, I will charge you to do just exactly what we spoke about in the voir dire process, is you go back there, use your reason and your common sense, and you ask yourself the questions that we spoke about in voir dire, and you arrive at a verdict that you think is appropriate in this case. Thank you.

In voir dire, Johnson told the panel:

The main thing to do and the main starting block for a criminal trial is that everybody must give the defendant in a case the presumption of innocence. The State's talked to y'all about that, and a couple of you said that you have a problem with the presumption of innocence. And the main thing about that is a lot of people will sometimes say, well—you have heard of the old expression "where there is smoke, there is fire." And a lot of people think that just because someone's down here and they have been charged and indicted by a grand jury that they're automatic and probably guilty.

So it's important, as you come into the courtroom, everybody steps back and recognizes the fact that all we have right now is an allegation and an accusation that the defendant has committed a criminal act. So it's very important to be able to sit there and set aside any preconceived ideas you might have and say that I will sit here and give the defendant the benefit of the doubt, and I will understand that in order for him to be found guilty, it is not required that he prove himself to be innocent but it is required that the State of Texas prove, if they can, that he is guilty. Okay? So that's the very first thing, and the prosecution talked to you about that.

The second part that you have to understand is that the State of Texas always has the burden of proof. That means it's required that the jurors always look to this table to see whether or not the State has brought to you the kind of evidence that will convince you of a person's guilt. I'll be the first one to tell you, and they'll probably agree, jurors in this building hear cases all the time where the jurors come back and say Mr. Prosecutor, Madam Prosecutor, you didn't convince us. You did not convince us beyond all reasonable doubt, and we find the defendant not guilty.

At the hearing on Rubio's amended motion for new trial, Rubio questioned Johnson about whether he conceded guilt in his closing argument:

Q. Mr. Rubio has indicated that throughout any conversations you had, he did not believe he was guilty and asked you not to say he was guilty; is that correct?

A. That's completely incorrect, ma'am.

Q. Did he ask you not to say he was guilty right before closing argument?

A. No, he didn't. And I didn't say he was guilty, but we – ma'am, it's on the -- it was put on the record before the trial, leading up to the trial, during the trial the nature of the issues that we had in this case, and he said on all of those occasions that he understood the predicament and the situation that he was in. I spoke with him during the trial about the fact that each one of these witnesses that got up and testified against him were basically telling -- he had no dispute with anything any of them were saying. I've asked him if there was any questions that he could think of for me to ask, anything that might elucidate something in his favor and --

Q. Well, Mr. Johnson, I mean, you're the attorney. So you don't recall him ever asking you to say he's not guilty? You entered a plea of not guilty, correct, for him?

A. Yes, ma'am.

Q. But you never recalled him asking you to say he wasn't guilty?

A. He never -- there was no issue about whether or not -- he understood the issues. There was not a – I mean, the trial was only conducted due to the fact that the State would not give us an avenue to escape the trial. And I told him that -- I mean, I would never have walked in there and had him walk and concede guilt to the sentence. The State was going to have to go through the mechanics of going through their case. I didn't say during voir dire that he was guilty. I didn't say during punishment he was guilty.

Q. Did you have a conversation with him right before you made closing argument, just you and him at counsel table?

A. I'm sure I did. Yes, ma'am, I saw his rendition of that -- or I can't remember exactly what his rendition was where he apparently said I

made a flip comment to him or something, but I dispute the accuracy of that completely.

Q. Okay. Well, can you tell me what was said?

A. Ma'am, I had many, many conversations with Chris during the trial. Like I said, it was also the fact that he was understanding of the situation. In fact, he was appreciative of the -- of the way I treated not only him with kindness and courteous, but also the members of his family and the people that he had up here that were with him.

Q. Do you recall what your closing argument was to the jury?

A. I told the jury, just as I told them in the voir dire portion, that the State of Texas brings the case, they're required to come in there and prove it, and the jury's entitled to listen to all the evidence and make a decision. And I told them just as -- I don't recall specifically or by the words of what I said, but I believe I told them that --

Q. Did you tell them to use their common sense?

A. I did in voir dire.

Q. You didn't tell them that in closing argument?

A. Again, I don't remember the exact -- I didn't have a prepared script for closing argument.

Q. Did you tell them you wouldn't insult their intelligence?

A. I may have -- I may have, yes, ma'am.

Q. If you did, what did you mean by that?

A. Just that you can – I'm not going to stand here and insult your intelligence, you guys consider the evidence. We held the State to their burden of proof. There was certainly no question that when it was over that there would have been really no possible way for a rational trier of fact to have found anything other than what the logical conclusion was.

Q. What was that?

A. That Chris had committed the act.

Q. That he was guilty, yes?

A. Yes, but I didn't stand up there and tell them that he was or didn't invite them to find him guilty. I told them if the State proved their case, they were entitled to their verdict, and if they failed to prove their case as stated in the indictment, then the defendant was entitled to a verdict.

At the end of the hearing, Rubio argued to the court that Johnson "effectively conceded guilt in closing. Even if he didn't say the words, he just testified on the stand that the logical conclusion of what he said was that Rubio was guilty. And in conceding guilt to the jury, Johnson effectively revoked his agency of Rubio under *McCoy v. Louisiana*." The State argued Johnson "testified that he did not concede guilt [sic] of Mr. Rubio in closing argument."

We conclude Johnson did not concede Rubio's guilt in his closing argument. Johnson's closing argument, considered in context with his statements made in voir dire, did not concede Rubio's guilt. Johnson did not state that Rubio committed murder, and he did not concede facts that would have supported a finding of any elements of the offense of murder. Instead, Johnson argued "the State has to be held to meet their burden of proof, and that same thing applies whether they have a good case or a bad case." Nothing presented at the hearing on Rubio's amended motion for new trial affects our analysis of this issue. A violation under *McCoy v. Louisiana* requires, first, a showing that counsel admitted guilt; the record before us shows no such thing. Rubio's first issue is overruled.

### *Ineffective assistance of counsel*

In his second and third issues, Rubio argues he received ineffective assistance of counsel under *United States v. Cronic*, 466 U.S. 648 (1984), and *Strickland v. Washington*, 466 U.S. 668 (1984). Rubio bases his claims on the Fifth, Sixth,

Eighth, and Fourteenth Amendments to the U.S. Constitution and corresponding Texas constitutional provisions.[4]

We review a trial court's denial of a motion for new trial for an abuse of discretion, reversing only if the trial court's decision was clearly erroneous and arbitrary. *Okonkwo v. State*, 398 S.W.3d 689, 694 (Tex. Crim. App. 2013); *see also Bright v. State*, No. 05-13-00997-CR, 2015 WL 2400738, at *2 (Tex. App.—Dallas May 19, 2015, pet. ref'd) (mem. op., not designated for publication) ("When, as here, an appellant presents his ineffective assistance of counsel claim to the trial court in a motion for new trial, an appellate court analyzes the claim as a challenge to the denial of the new trial motion and reviews the trial court's ruling for abuse of discretion."). A trial court abuses its discretion if, viewing the evidence in the light most favorable to the trial court's decision, no reasonable view of the record could support its ruling. *Okonkwo*, 398 S.W.3d at 694. In the absence of express findings, as here, we presume the trial court made all findings, express and implied, in favor of the prevailing party. *Id*.

A defendant is entitled to reasonably effective assistance of counsel under the Sixth Amendment to the United States Constitution and under section 10 of article I of the Texas Constitution.[5] U.S. CONST. amend. VI; TEX. CONST. art. I, § 10.

---

[4] "[S]ince the Texas constitutional and statutory provisions do not provide any greater protection than the Federal provisions, Texas has adopted the *Strickland* two prong test" in evaluating ineffective assistance of counsel claims. *See Hathorn v. State*, 848 S.W.2d 101, 118 (Tex. Crim. App. 1992).

[5] We largely reproduce the following discussion of applicable law from our prior opinion. *Rubio*, 596 S.W.3d 410.

Generally, we review ineffective assistance of counsel claims under the *Strickland v. Washington* standard, which, to obtain a reversal of a conviction, requires an appellant to demonstrate by a preponderance of the evidence that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. 466 U.S. 668, 687 (1984).

Our review of counsel's representation under the first prong of *Strickland* is highly deferential. We indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance, including the possibility that counsel's actions were strategic. *Strickland*, 466 U.S. at 689; *see also Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000); *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). We focus on the totality of the representation afforded and not on individual alleged errors. *Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010). We consider the adequacy of assistance as viewed at the time of trial, not in hindsight. *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). We may not second-guess counsel's strategic decisions, *Frangias v. State*, 450 S.W.3d 125, 136 (Tex. Crim. App. 2013), and defense counsel's trial strategy cannot be considered ineffective assistance of counsel simply because another attorney would have used a different strategy, *Ex Parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012). The right to counsel does not mean the right to errorless counsel. *Frangias*, 450 S.W.3d at 136.

To defeat the presumption of reasonable representation, an allegation of ineffectiveness must be firmly founded in the record and the record must affirmatively demonstrate the alleged ineffectiveness. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001). We will not speculate to find defense counsel ineffective. *Wilson v. State*, No. 05-17-01003-CR, 2018 WL 6333245, at *3 (Tex. App.—Dallas Nov. 29, 2018, no pet.) (mem. op., not designated for publication); *see also Wood v. State*, 260 S.W.3d 146, 148 (Tex. App.—Houston [1st Dist.] 2008, no pet.). A silent record that provides no explanation for counsel's actions will not overcome the strong presumption of reasonable assistance. *Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003); *Thompson*, 9 S.W.3d at 814. Thus, if the record does not contain affirmative evidence of trial counsel's reasoning or strategy, we normally presume counsel's performance was not deficient. *See Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002).

To show prejudice under the second prong of *Strickland*, an appellant must demonstrate a reasonable probability that the outcome would have differed but for trial counsel's errors. *Strickland*, 466 U.S. at 694; *see also Jackson*, 877 S.W.2d at 771. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Jackson*, 877 S.W.2d at 771 (quoting *Strickland*, 466 U.S. at 694). It is not sufficient to show defense counsel's errors "had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Rather, to establish prejudice, an appellant must show that counsel's errors were "so serious as to deprive

defendant of a fair trial, a trial whose result was reliable." *Id*. at 687. Failure to satisfy either prong of the *Strickland* standard is fatal. *Perez*, 310 S.W.3d at 893; *Ex parte Martinez*, 195 S.W.3d 713, 730 n.14 (Tex. Crim. App. 2006); *Rylander*, 101 S.W.3d at 110. Thus, we need not examine both *Strickland* prongs if one cannot be met. *Strickland*, 466 U.S. at 697.

In rare cases, an appellant claiming ineffective assistance of counsel is not required to show prejudice; rather, prejudice is presumed and the appellant only is required to show deficient performance. *Cronic*, 466 U.S. at 658–60; *see also Florida v. Nixon*, 543 U.S. 175, 190 (2004). In *Cronic*, the Supreme Court identified three situations implicating the right to counsel so likely to prejudice the accused that prejudice is presumed: (1) the accused was denied the presence of counsel at a critical stage of trial, (2) counsel entirely failed to subject the prosecution's case to meaningful adversarial testing, or (3) circumstances at trial were such that, although counsel was available to assist the defendant during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial. 466 U.S. at 659–60. Here, Rubio contends prejudice is presumed due the second circumstance—counsel entirely failed to subject the State's case to meaningful adversarial testing.

We may presume prejudice under *Cronic* with respect to Rubio's ineffective assistance claim only if his attorney's failure to subject the State's case to meaningful

–29–

testing was complete. *Id*. at 659 (prejudice is presumed if "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"); *see also Giles v. State*, No. 05-18-00865-CR, 2019 WL 6486257, at *4 (Tex. App.—Dallas Dec. 3, 2019, no pet.) (mem. op., not designated for publication). "[B]ad lawyering, regardless of how bad, does not support the presumption of prejudice under *Cronic*." *Childress v. Johnson*, 103 F.3d 1221, 1229 (5th Cir. 1997). Rather, there must be "a constructive denial of the assistance of counsel altogether." *Cannon v. State*, 252 S.W.3d 342, 349 (Tex. Crim. App. 2008) (citing *Cronic*, 466 U.S. at 658–59). The Texas Court of Criminal Appeals has explained:

> [A] defendant is denied counsel not only when his attorney is physically absent from the proceeding, but when he is mentally absent as well, i.e., counsel is asleep, unconscious, or otherwise actually non compos mentis. This prong of *Cronic* is epitomized by the "inert" or "potted plant" lawyer who, although physically and mentally present in the courtroom, fails to provide (or is prevented from providing) any meaningful assistance. In this situation, courts presume prejudice based upon the actual or constructive denial of counsel "when such absence threatens the overall fairness of a trial."

*Ex parte McFarland*, 163 S.W.3d 743, 752–53 (Tex. Crim. App. 2005).

In *Cannon*, the court of criminal appeals applied the *Cronic* presumption of prejudice where defense counsel "effectively boycotted the trial proceedings" and "abandoned his role as advocate for the defense." 252 S.W.3d at 350 (noting that counsel, in part, declined to participate in jury selection, declined to make objections, declined to cross-examine State witnesses, declined to make an opening or closing argument, and declined to offer any defense because he was "unprepared to go

–30–

forward"). Moreover, *Cronic* recognized, "the Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interest of his client by attempting a useless charade. At the same time, even when no theory of defense is available, if the decision to stand trial has been made, counsel must hold the prosecution to its heavy burden of proof beyond a reasonable doubt." 466 U.S. at 656 n.19 (internal citation omitted).

The difference between the *Cronic* and *Strickland* standards is not of degree, but of kind. *Bell v. Cone*, 535 U.S. 685, 697 (2002). In other words, the standards distinguish between shoddy representation and none at all. *Childress*, 103 F.3d at 1229. If Rubio received "some meaningful assistance," there was no constructive denial of counsel and *Cronic* does not apply. *Id*. Accordingly, prejudice only may be presumed if Rubio establishes his attorney was not merely incompetent but inert. *Id*. at 1228.

### *Relief under* Cronic

In his second issue, Rubio argues he received ineffective assistance of counsel under the *Cronic* standard because his trial attorney "wholly failed to subject [his] case to meaningful adversarial testing." Previously, we concluded as follows:

> Rubio does not complain he was denied counsel at a critical stage of trial or that defense counsel was inert. Rather, Rubio complains of his attorney's alleged errors, omissions, and strategic decisions, all of which go to incompetence. The record does not support a finding that Rubio had no meaningful assistance of counsel, that defense counsel

–31–

was inert, or that counsel's failure to test the State's case was "complete." To the contrary, the record as a whole reflects that defense counsel served as Rubio's legal advocate throughout trial. During voir dire, Rubio's attorney questioned and instructed the venire panel regarding the State's burden of proof and the presumption of innocence afforded to Rubio. Defense counsel's closing statement reminded the jury of its obligation to hold the State to its burden of proof. Rubio told the trial court his attorney had consulted him and he agreed with his attorney's decision to not cross-examine witnesses or present expert witness testimony. The extreme circumstances required to presume prejudice are not before us in this case. Therefore, we conclude the *Cronic* presumption of prejudice does not apply and Rubio's ineffective assistance of counsel claim is governed by *Strickland*.

596 S.W.3d at 429.

Considering the arguments and evidence presented at the hearing on Rubio's amended motion for new trial hearing, we again conclude the extreme circumstances required to presume prejudice are not before us in this case. Johnson's testimony at the hearing on the amended motion for new trial reflected that he communicated with Rubio; discussed discovery with him on several occasions; learned about Rubio's background; made a professional judgment that Rubio's case was indefensible from the "standpoint of the facts of what had occurred," but was focused on "what we could possibly do for him for purposes of some type of mitigation of a punishment"; explored the possibility of an insanity defense based on several possible mental health problems; hired a psychologist and interviewed Rubio's family members to help make that determination; sought a plea bargain offer from the State; and took the case to trial to hold the State to its burden because there was no alternative when the State did not offer a plea bargain.

This evidence reflects that Rubio received meaningful assistance from counsel before and during trial, and accordingly, we conclude *Cronic* does not apply, and Rubio's ineffective assistance of counsel claims should be analyzed under *Strickland*. It is true that Rubio's affidavit contradicted Johnson's testimony in particular respects—for example, the extent to which Johnson discussed discovery with Rubio. But, in the context of a motion for new trial hearing, the credibility of witnesses and the probable truth of any new evidence "is primarily a determination for the trial court," and we will not second guess the trial court's judgment concerning witness credibility. *Hoyos v. State*, 951 S.W.2d 503, 511 (Tex. App.—Houston [14th Dist.] 1997), aff'd, 982 S.W.2d 419 (Tex. Crim. App. 1998).

### *Relief under* Strickland

Rubio alternatively argues he received ineffective assistance of counsel under the traditional *Strickland* standard. He argues Johnson failed to file substantive motions, make an opening statement, cross-examine the State's witnesses, call defense witnesses, file a formal discovery request, subpoena witnesses, ask the trial court for a continuance, hire an investigator, or conduct an investigation. Considering the trial record, the amended motion for new trial hearing record, and the arguments presented at the hearing and in Rubio's brief, we conclude Rubio has failed to show either that Johnson rendered deficient performance or that Rubio was prejudiced by any such performance. *See Strickland*, 466 U.S. at 687.

*Insanity defense*

Rubio argues Johnson failed to adequately investigate and pursue an insanity defense. Texas law excuses a defendant from criminal responsibility if he proves, by a preponderance of the evidence, the affirmative defense of insanity. TEX. PENAL CODE § 8.01; *Ruffin v. State*, 270 S.W.3d 586, 592 (Tex. Crim. App. 2008). "The test for determining insanity is whether, at the time of the conduct charged, the defendant—as a result of a severe mental disease or defect—did not know that his conduct was 'wrong.'" *Ruffin*, 270 S.W.3d at 592. "Wrong" in this context means illegal. *Id*. Thus, the question for purposes of an insanity defense is whether Rubio factually knew that society considered killing the two victims to be against the law, even if, due to his mental disease or defect, he thought the conduct was morally justified. *Id*. If Rubio knew his conduct was illegal by societal standards, then an insanity defense was not available to him. *Id*.

Evidence presented at the hearing on the amended motion for new trial shows that Johnson investigated and considered raising the defense of insanity and concluded it was not meritorious. Johnson personally "never saw any signs whatsoever that Rubio was insane at any time during my representation or anything that would lead me to believe that he was suffering from any type of insanity at the time of the offense." When Rubio told him he had multiple personalities and had been hearing voices, Johnson interviewed Rubio's family members and girlfriend to try to substantiate Rubio's claims. Further, Johnson hired Dr. Compton to

investigate any mental health problems Rubio might have had. Johnson did not limit Dr. Compton's inquiry, and he stated he knew her to be creative but ethical in determining whether criminal defendants had any basis for alleging insanity. Dr. Compton met with Rubio more than once, she interviewed Rubio's family members and girlfriend, and she reviewed Rubio's records. Dr. Compton concluded there was nothing to support a defense of insanity. *See Gottson v. State*, 940 S.W.2d 181, 185 (Tex. App.—San Antonio 1996, pet. ref'd) (no ineffective assistance of counsel when counsel "did investigate and research the possibility of an insanity defense"); *Taylor v. State*, No. 06-09-00128-CR, 2010 WL 2802455, at *5 (Tex. App.—Texarkana July 16, 2010, no pet.) (mem. op., not designated for publication) (no ineffective assistance of counsel when defense counsel "believed Taylor could discern right from wrong, and Taylor has presented no significant evidence to undermine Bass's belief, we cannot say Bass was ineffective for failing to further investigate the possibility of an insanity defense").

The trial court also had before it Dr. Stanulis's and Rubio's affidavits. But given the foregoing, we do not think the trial court was required to accept Dr. Stanulis's conclusion—which he conceded was not fully-informed—that there existed "viable avenues for pursuing a defense of insanity" or Rubio's statements that he did not remember the offense or his other statements regarding his mental state. A trial court is not required to accept statements made in an affidavit but may believe all, some, or none of them. *E.g.*, *Biagas v. State*, 177 S.W.3d 161, 171 (Tex.

–35–

App.—Houston [1st Dist.] 2005, pet. ref'd) (citing *Charles v. State*, 146 S.W.3d 204, 213 (Tex. Crim. App. 2004)).

Furthermore, as we concluded before, and as Johnson testified at the hearing on the amended motion, the evidence presented at trial did not support an insanity defense. Instead,

> the evidence establishes that Rubio knew his conduct was wrong. After Rubio returned from his first confrontation at Connie's apartment, Dana tried to calm him in order to stop him from loading his shotgun and taking it with him on his return to Connie's apartment. Rubio responded that he was "tired" and could not "do it anymore." Immediately after he killed Elizabeth and James, Rubio fled Connie's apartment and ran to his own apartment, where he confessed the murders to Dana.

*Rubio*, 596 S.W.3d at 431. Johnson stated the evidence showed Rubio's motivation in committing the murders was anger and rage that his ex-girlfriend left him for another man, and the situation spiraled out of control. Johnson's testimony reflected that Rubio believed he was responsible for the offense, and though it was not admitted at trial, Rubio had "given a confession" to committing the offense.

Given all this, Johnson concluded Rubio's self-reported multiple personalities and hearing voices were "more of a case of malingering to escape criminal responsibility" and Rubio was not insane when he committed the offense. Rubio nevertheless argues Johnson "had nothing to lose" by pursuing an insanity defense. But our inquiry here is whether, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Johnson explored the possibility of an insanity defense,

–36–

and he enlisted a psychologist to help his exploration; based on that, he then reasonably determined, in light of the facts of the offense, that Rubio was not insane at the time of the offense. Johnson's conduct relating to the investigation of a defense of insanity and his decision not to pursue it fell within the wide range of professionally competent assistance.

*Mitigating evidence*

Texas law provides only two possible punishments in the event of conviction for capital murder: life imprisonment or death.

> (a) An individual adjudged guilty of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for:
>
> (1) life, if the individual committed the offense when younger than 18 years of age; or
>
> (2) life without parole, if the individual committed the offense when 18 years of age or older.

TEX. PENAL CODE § 12.31(a). When the State seeks the death penalty, mitigating evidence may be presented at the punishment phase of trial, so the jury may determine whether any mitigating circumstances warrant a sentence of life imprisonment rather than a death sentence. TEX. CODE CRIM. PROC. art. 37.071, § 2. When the State waives the death penalty in a capital murder case, no mitigating evidence is required—there is no need to offer evidence of mitigating factors when no greater punishment than the minimum requisite punishment for the offense may be imposed.

Because the State did not seek the death penalty here, the trial court was required to impose a sentence of life without parole if Rubio was found guilty. Thus, there was no opportunity for defense counsel to present mitigating evidence at trial for punishment purposes. Moreover, Johnson testified at the hearing on the amended motion that he presented mitigating information to the State pretrial, attempting to secure a plea bargain. Johnson approached the State dozens of times attempting to secure a plea bargain. In those meetings, Johnson emphasized that Rubio "was a troubled kid, he had a bad time, and he was -- went through a bad situation . . . ." Johnson stated the lead prosecutor was "well aware of the situation and she was sympathetic to it." Johnson thought the State was unwilling to offer a plea bargain because the victim's family was adamant in wanting a life sentence without the possibility of parole. Johnson did not think a more formal presentation of mitigating evidence would have made a difference. We conclude Rubio has failed to overcome the strong presumption of reasonable assistance with respect to defense counsel's presentation to the State of mitigating evidence in an attempt to reach a plea bargain.

Moreover, we conclude Rubio has failed to show a reasonable probability that any mitigating evidence would have persuaded the State to offer a plea bargain to a lesser offense. *See Strickland*, 466 U.S. at 694 (to show prejudice, an appellant must demonstrate a reasonable probability that the outcome would have differed but for counsel's errors); *cf. Ex parte Uribe*, 516 S.W.3d 658, 667 (Tex. App.—Fort Worth 2017, pet. ref'd). Nothing in the record before us shows the State was willing to

offer any plea bargain; on the contrary, all we have before us is Johnson's testimony that the State was unwilling to offer a plea to a lesser offense.

*Opening statement*

Rubio complains trial counsel did not make an opening statement. As we observed before, the option for defense counsel to deliver an opening statement after the State's opening statement is discretionary. TEX. CODE CRIM. PROC. art. 36.01(b). Waiving opening argument is an inherently tactical decision. *Taylor v. State*, 947 S.W.2d 698, 704 (Tex. App.—Fort Worth 1997, pet. ref'd); *see also Calderon v. State*, 950 S.W.2d 121, 128 (Tex. App.—El Paso 1997, no pet.) (opening statement may have been "deemed unnecessary, if not strategically undesirable," if trial strategy is to demonstrate State did not prove case beyond a reasonable doubt); *Standerford v. State*, 928 S.W.2d 688, 697 (Tex. App.—Fort Worth 1996, no pet.) (waiving opportunity to make opening statement is a tactical decision and "would have given the State a preview of the defense's strategy").

At the hearing on Rubio's amended motion, Johnson was asked if he made an opening statement, and he said, "No, ma'am, I generally don't." Nothing in the record before us sheds light on why trial counsel did not make an opening statement here. But given counsel's strategy of holding the State to its burden to prove the commission of the offense beyond a reasonable doubt, counsel may have decided an opening statement was "unnecessary, if not strategically undesirable[.]" *See Calderon*, 950 S.W.2d at 128. Even supposing it were deficient for defense counsel

to waive opening, we do not think Rubio has demonstrated a reasonable probability that the outcome would have differed but for trial counsel's decision to forgo an opening statement. *Strickland*, 466 U.S. at 694.

*Cross-examination of witnesses/calling witnesses*

Rubio also complains his attorney did not cross-examine the State's witnesses or call witnesses to testify. As we previously noted, "Cross-examination is inherently risky, and a decision not to cross-examine a witness is often the result of wisdom acquired by experience in the combat of trial." *Ex parte McFarland*, 163 S.W.3d at 756 (citing *Coble v. State*, 501 S.W.2d 344, 346 (Tex. Crim. App. 1973)). "Furthermore, cross-examination is an art, not a science, and [the decision not to cross-examine a witness] cannot be adequately judged in hindsight." *Ex parte McFarland*, 163 S.W.3d at 756. "If ineffective, cross-examination can serve to bolster the credibility of the witnesses and underscore the very points that are sought to be impeached. Thus, unless there is a good basis on which to cross-examine . . . it can be more effective to refrain from cross-examining a damaging witness to minimize the impact of his testimony." *Dannhaus v. State*, 928 S.W.2d 81, 88 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd).

At the hearing, Johnson was not asked to explain his decision not to cross-examine the State's witnesses. However, the trial record shows Rubio discussed this decision with Johnson and he expressed to the trial court there was "nothing said or raised in the courtroom [he] felt was necessary to cross-examine."

–40–

As detailed above, during the course of trial and out of the presence of the jury, Johnson acknowledged,

> it's very unusual that I hadn't been cross-examining these witnesses with regards to their recollection of the events that transpired, but I've discussed those things with you, and you have been in agreement that basically there's nothing, other than extremely minor points that have nothing to do with the actual activities of what took place that day. You've been in agreement through this point that there has been nothing said or raised in the courtroom that you felt was necessary to cross-examine; is that correct?
>
> Rubio: I could not think of anything.
>
> Defense counsel: Right. You and I spoke about it because you knew that I had previously interviewed Dana as well as the other witnesses and talked to them about the mental states and your behavior and those things. Just so that the record's clear, this is—the way we're conducting this trial has been done after we discussed it with each witness and you have been in agreement; is that correct?
>
> Rubio: Yes, sir.

Thus, Rubio was fully informed of and agreed with his attorney's decision not to cross-examine the State's witnesses. And Johnson reasonably could have determined that cross-examination of the State's witnesses would have been more damaging than beneficial. Rubio has not overcome the strong presumption that his attorney's decisions regarding cross-examination fall within the wide range of reasonable professional assistance. *Ex parte McFarland*, 163 S.W.3d at 755–57.

A claim of ineffective assistance of counsel based on counsel's failure to call witnesses fails in the absence of a showing of prejudice, i.e., that witnesses were available to testify and that the defendant would have benefitted from their

testimony. *Perez,* 310 S.W.3d at 894 ("failure to call witnesses at the guilt-innocence and punishment stages is irrelevant absent a showing that such witnesses were available and appellant would benefit from their testimony") (quoting *King v. State,* 649 S.W.2d 42, 44 (Tex. Crim. App. 1983)). Thus, Rubio must identify witnesses defense counsel should have called and demonstrate a reasonable probability that but for counsel's failure to call these witnesses to testify, "the result of the proceeding would have been different" because "the factfinder would have had a reasonable doubt respecting guilt." *Strickland,* 466 U.S. at 694–95.

Here, the record contains no indication of any witness who, if called, would have been helpful to Rubio's case. At the hearing on the amended motion, Johnson, when questioned whether he called any defense witnesses, stated that "there was no defense case — I mean, there was no defensive issues to present." He further explained there was no need to subpoena anyone because "the State had subpoenaed everybody else that had any factual knowledge of the case." We conclude defense counsel's decision not to call witnesses could be considered trial strategy and Rubio has not overcome the presumption that his attorney's conduct was reasonable. *See Crocker v. State,* 248 S.W.3d 299, 306 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (recognizing defendant may "merely elect[] to hold the State to its burden of proof rather than present his own evidence").

*Pretrial motions and discovery*

Rubio complains defense counsel "relied solely on the State to turn over its discovery" and did not make a formal discovery request under article 39.14 of the Texas Code of Criminal Procedure, defense counsel did not file pre-trial motions "other than a standardized 'omnibus' pre-trial motion," and did not request a continuance. Rubio's contention that defense counsel was ineffective because he failed to file pretrial motions fails. In general, trial counsel's failure to file pretrial motions does not result in ineffective assistance of counsel. *See Martinez v. State*, 449 S.W.3d 193, 208 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). Rubio must show a pretrial motion had merit and a ruling on the motion would have changed the outcome of the case. *See Roberson v. State*, 852 S.W.2d 508, 511 (Tex. Crim. App. 1993); *see also Straight v. State*, 515 S.W.3d 553, 565 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). Rubio has not identified any specific pretrial motion counsel should have filed other than a written request for discovery under article 39.14 of the Texas Code of Criminal Procedure. Article 39.14, however, does not require an attorney to file a discovery request, but rather, states that "as soon as practicable after receiving a timely request from the defendant the state shall produce and permit the inspection" of certain documents. TEX. CODE CRIM. PROC. art. 39.14. Moreover, Rubio has not indicated and the record—including the hearing on the amended motion—does not show what Rubio could or should have received—that he did not receive—had defense counsel filed such a motion; how any such evidence would

have changed the outcome of the case; or whether and how Rubio was prejudiced by defense counsel's failure to make such a request.  Accordingly, Rubio has failed to show how counsel's actions were deficient or articulate a reasonable probability that, but for counsel's actions, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 687; *see also Giles*, 2019 WL 6486257, at *5; *Hoffman v. State*, No. 09-17-00172-CR, 2018 WL 5930308, at *8 (Tex. App.—Beaumont Nov. 14, 2018, pet. ref'd) (mem. op., not designated for publication) (ineffective assistance of counsel claim failed because appellant made no showing trial counsel's failure to obtain discovery would have changed outcome of trial or that it prejudiced her in any way).

Additionally, nothing in the record before us indicates defense counsel needed more time to prepare for trial and should have requested a continuance.  Therefore, the record does not support the proposition that defense counsel was deficient in failing to seize an opportunity to delay the trial.  Based upon the record before us, we are unable to conclude that defense counsel's actions with respect to the filing of pretrial motions and discovery were unreasonable, and, thus, deficient.

*Objections to State evidence*

Rubio's complaint that his attorney was ineffective because he made few objections to the State's evidence also fails.  Rubio does not indicate what testimony Johnson should have objected to.  Nor does the trial record show that the trial court would have sustained any additional objections to State witness testimony.  The

–44–

record, including the record of the hearing on Rubio's amended motion for new trial, is silent as to the reasons defense counsel did not object more to the State's witness testimony, and we must presume the actions taken by trial counsel were part of a strategic plan for representing his client. *See Duren v. State*, 87 S.W.3d 719, 733–34 (Tex. App.—Texarkana 2002, no pet.); *see also Young*, 991 S.W.2d at 837–38.

In sum, viewing defense counsel's representation in its totality, we conclude Rubio has failed to meet his burden to demonstrate he received ineffective assistance of counsel. The evidence before us shows defense counsel investigated the feasibility of an insanity defense, and hired a psychologist to assist him in that effort. He reasonably concluded such a defense was not available to Rubio in this case. Defense counsel sought a plea bargain offer from the State. When the State made no such offer, Rubio went to trial out of necessity, and counsel's strategy was to hold the State to its burden. On these unusual facts, we conclude Rubio has failed to demonstrate that (1) counsel's performance fell below an objective standard of reasonableness, or that (2) there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 687. Accordingly, we conclude the trial court did not abuse its discretion by denying Rubio's amended motion for new trial. *See Okonkwo*, 398 S.W.3d at 694; *Bright*, 2015 WL 2400738, at *2. Rubio's second and third issues are overruled.

## Conclusion

Having overruled Rubio's appellate issues, we affirm the trial court's judgment.

/Ken Molberg/
KEN MOLBERG
JUSTICE

180861f.u05
DO NOT PUBLISH
Tex. R. App. P. 47



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

CHRISTOPHER MICHAEL RUBIO, Appellant

No. 05-18-00861-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 363rd Judicial District Court, Dallas County, Texas Trial Court Cause No. F-1633703-W. Opinion delivered by Justice Molberg. Justices Partida-Kipness and Smith participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 1st day of June, 2023.